IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANDREW N. LEWIS,                    )   No. C 04-2857 MJJ (PR)
                                    )
            Petitioner,             )   **ORDER DENYING PETITION**
                                    )   **FOR A WRIT OF HABEAS**
    v.                              )   **CORPUS**
                                    )
D.L. RUNNELS, Warden,               )
                                    )
            Respondent.             )
_____     )

     Petitioner is a California prisoner who filed this pro se habeas corpus petition pursuant to 28 U.S.C. § 2254.  The Court ordered respondent to show cause why the petition should not be granted on the basis of petitioner's cognizable claims.  Respondent filed an answer accompanied by a memorandum and exhibits contending that the petition should be denied.  Petitioner did not file a traverse.  The matter is submitted.

### PROCEDURAL BACKGROUND

     Petitioner was convicted by a jury in Alameda County Superior Court of voluntary manslaughter, attempted voluntary manslaughter, and discharging a firearm at an occupied motor vehicle.  The trial court sentenced petitioner to twenty-three years in state prison.  The California Court of Appeal affirmed the convictions, and denied petitioner's state petition for a writ of habeas corpus.  Petitioner challenged his conviction in a petition for review to the California Supreme Court.  This petition was denied.

G:\PRO-SE\MJJ\HC.04\lewis.dny.wpd

On July 15, 2005, petitioner filed with this Court a federal habeas corpus petition containing four claims.  The first three claims were previously presented to the California Supreme Court in the petition for review, but petitioner had not yet raised the claim that the trial court erred in refusing to instruct the jury on the defense of another.  On November 23, 2004, respondent moved to dismiss the petition on the ground that it contained an unexhausted claim.  On August 29, 2005, this Court stayed the proceedings and held the federal petition in abeyance to allow petitioner to exhaust his fourth claim in the California Supreme Court.  Petitioner presented his fourth claim to the California Supreme Court in a petition for writ of habeas corpus on September 12, 2005.  Petitioner added to that habeas petition the claim that his state appellate attorney had been ineffective for failing to raise the fourth claim in the initial state petition for review.  On June 21, 2006, the California Supreme Court denied the habeas petition.  On or about July 7, 2006, petitioner filed in this Court an amended petition for writ of habeas corpus.

As grounds for habeas relief, petitioner asserts that: (1) Trial counsel was ineffective for failing to seek a mistrial or curative admonition regarding a prospective juror's statements during voir dire; (2) the prosecutor committed misconduct by violating the trial court's orders excluding any reference to petitioner's prior police contacts, his bulletproof vest, and his gang affiliations; (3) his due process rights were violated because the trial court refused to instruct the jury on a theory of defense of another person; and (4) appellate counsel was ineffective for not raising the claim that the trial court erroneously refused to instruct the jury on the defense of another person.

## FACTUAL BACKGROUND

The following facts are set forth in the California Court of Appeal opinion:

Prosecution Case

Raymond Daniels testified that on Friday night, May 22, 1998, he and his friend, Travis Taylor, drove to Harry's Liquor Store at 90th Avenue and McArthur Boulevard in Oakland to buy some chips and soda for Daniels's mother, who lived nearby.  There were about 20 to 25 people in the parking lot and near the store at that time, waiting for a "sideshow"

(cars cruising and doing maneuvers at the intersection of 90th and McArthur) to start. Although Daniels recognized many of the faces from the neighborhood, he only knew two or three of the people by name.

When he and Taylor entered the store, Daniels came face to face with appellant[1], with whom he went to high school and had engaged in several previous confrontations. Appellant said in a mad voice, "you all in my fucking grill," and Daniels asked appellant, "what do you want to do?" Appellant and Daniels then "squared up," sizing each other up for a fight. A bald-headed man who seemed to know appellant came up and pleaded with Daniels to let appellant go about his business. Appellant then walked out to the store "rambling about some stuff about Ghost Town and where he was from and all this." He also said something about "beat[ing] your mother fucking ass." Daniels was also getting in appellant's "face." Taylor said a couple of things to appellant about "beating his ass."

They all walked out of the store and appellant got into his car and drove away. Taylor then got a bottle out of a nearby garage can and threw it at appellant's car. The bottle hit and broke the passenger window of appellant's car. Appellant briefly hit the brakes, but then kept on driving away.

Daniels and Taylor got into their car in the parking lot, and were waiting for a car that was blocking their exit to move, when, less than two minutes after he had left, appellant's car came screeching into the parking lot. Appellant got out of his car and Daniels saw a gun in his right hand. Appellant walked up to their car, and Taylor, who was in the driver's seat, opened his car door, telling appellant not to shoot him. Taylor then closed the door and appellant fired four shots into the car. The first shot missed them, the second and third shots hit Taylor, and the fourth shot hit Daniels in the arm. It all happened so fast; once Daniels realized that appellant was really shooting, he put his arm across his forehead to protect himself and got shot in the arm.

Taylor started backing the car up and Daniels fell out of the car into the street. He then saw appellant "fiddling with the gun, kind of pointed at me again." Appellant then ran back to his car and drove off. Daniels ran back towards Taylor's car, which had made a U-turn and hit a parked car. It took about 25 minutes for an ambulance to arrive, and Taylor and Daniels were taken to the hospital. Taylor had already passed away by then and Daniels was treated for the gunshot wound to his upper arm.

From the time appellant's car screeched to a stop in the parking lot through the time he came up and shot Taylor and Daniels, Daniels was certain that no one rushed appellant or his car. Also, Daniels saw a young lady in the passenger seat of appellant's car when appellant drove back to the parking lot and got out of his car.

Adrian Goodall testified that he was at Harry's Liquor Store on the night of the shooting. He was good friends with Taylor, and knew Daniels through Taylor. While Goodall was outside the store, Taylor and Daniels came out and told him they were having a problem in the store and asked him to come inside. Goodall got two other people and went in the store. Another man was with appellant, telling them all to let it go. It seemed like the incident was over; appellant left the store, and Taylor and Daniels

---

[1] Petitioner is referred to as "appellant" in the state court opinion.

followed.

Goodall then saw appellant drive away and saw Taylor and Daniels in their car waiting for someone who was blocking their way to move. As he was leaving the parking lot, Goodall saw appellant walking at normal speed towards Taylor's car with a pistol in his hand. He had his jacket on backwards, with the hood up trying to cover his face. He said something like, "what's up now" or "now what." Then he pointed the pistol and shot three times. After appellant shot the gun, he turned around and walked back out of the parking lot. No one threatened appellant or interfered with him when he walked to and from Taylor's car.

A group of 10 or 12 people who had gathered around Taylor's car flagged down a police officer who was driving by. The people became hostile when the officer started searching Taylor, who was barely breathing, rather than helping him. The officer ordered people to move away from the car, and eventually arrested Goodall. Goodall hit the officer and tussled with other officers before being put in the back of a police car. Goodall was taken to the police station and questioned, but apparently was never charged with any crime or charges were dropped. He never made a deal to testify in return for charges being dropped.

Rahsaan Jiltonilro testified that he was about 25 feet away from Taylor's car when he heard the sound of two gunshots. He looked over and saw appellant standing over Taylor, who was trying to cover himself. Jiltonilro saw Taylor's passenger run out of the car. Then he heard three more gunshots. He saw Taylor grabbing the gear shift and his body jerking as he was being shot, and he saw Taylor pull out and drive away, before crashing his car soon after. Neither Taylor nor Daniels had a gun in his hands at the time of the shooting.

No one seemed aware of appellant until the shots were fired, when people ducked out of the way. Then, as he ran to his car, people went after him. Appellant got into his car and drove away.

Dijnae Garrett testified that she was living with appellant's friend, Torrance Mackey, in May 1998. On the night of the shooting, appellant came to their apartment at about 12:30 a.m. Mackey left their bedroom and talked with appellant for awhile, and then returned and went to a dresser drawer, telling Garret not to go into the drawer. A few weeks later, police searched the apartment and found a gun in the drawer.[2]

Dyendis Davis testified that appellant was her boyfriend in May 1998. On the day before the shooting, Davis and appellant were driving around when appellant took a gun out of his waistband and talked Davis into shooting it out the window. The next evening, May 22, 1998, appellant drove Davis to work and picked her up around 10:10 p.m. He dropped her off at home and then went out alone. She paged him at about 1 a.m., and he called her back 30 minutes later. Davis could hear in his voice that something was wrong; he sounded sad. When she asked him what was wrong, he said, "Nothing man, nothing, just bad. It's all bad." When he returned to Davis's apartment about an hour later, appellant acted normal, but he had cuts on his knuckles. He told her that someone had thrown a glass bottle through his car window. He would not elaborate.

Appellant was arrested later that morning outside Davis's apartment.

---

[2] The gun was later determined to be the gun appellant used to shoot Taylor and Daniels.

Appellant called Davis from jail and asked her to bring a pen and piece of paper when she came to see him.  When she visited him at jail, appellant held up a piece of paper on his side of the glass partition that listed the names, addresses, and physical descriptions of Daniels and Goodall. Appellant told Davis to copy down the information; she did so, and put the paper in her pocket.  He did not tell her anything else about what to do with the information.  After the visit ended, a police officer arrested Davis and took the piece of paper from her.

Sergeant Enoch Joseph Olivas testified that on June 9, 1998, he met with Nirran Wells, after learning that Wells was appellant's cellmate at Santa Rita jail and that Wells was interested in talking about appellant. Wells told Olivas details of the murder that appellant had shared with him, including that appellant was in an argument ("mean-mugging") with Daniels at a store; that appellant was driving off in a yellow Cadillac when Taylor threw a bottle through the front passenger window; that appellant drove off but then stopped just down the block; that appellant went to the trunk of his car and pulled a handgun out of the trunk; that he came back to the store and walked up to the driver's side of Taylor's car; that he shot at both of them point-blank, hitting Taylor three times and Daniels once; and that he then fled in his car.

Wells also told Olivas that appellant had a jacket pulled up over his head to hide his identity.  He further told Olivas that appellant had said that Taylor's car was a stick shift and, at the time of the shooting, Daniels was telling Taylor to "drive on, . . . drive on[,]" as though they were having difficulty getting the car to move.  Wells said that appellant told him that Taylor had backed up and hit some other cars and was fumbling with the stick shift when appellant started shooting.  "[B]oth Mr. Daniels and Travis knew what was happening.  They looked at Andrew Lewis and they were both ducking down in the car, since they couldn't get the car to move fast enough they were sitting in the car, trying to duck down to lean over in an attempt to protect themselves."

Olivas further testified that Wells had told him that appellant had a 16-year-old girl in his car named Keisha, whom he drove home after the shooting.  Wells also said that appellant told him that he had gone to the house of Torrance Mackey ("T Mack") and switched guns with him before going to his girlfriend's house.

Finally, Wells told Olivas that appellant had said he wanted friends of his on the outside to kill witnesses in the case so that he could have a speedy trial.  Appellant planned to get Dyendis Davis to tell T Mack and "E.G." to kill two witnesses; appellant got the information from the defense copy of the police report.  Wells called Olivas on June 11, 1998, and told him that Davis would be visiting appellant later that day.  After appellant and Davis met, Olivas and another officer detained Davis and recovered a piece of paper with names, addresses, and physical descriptions of Adrian Goodall and Raymond Daniels.  Another piece of paper with similar information was found in appellant's cell; that paper also had Rahsaan Jiltonilro's name and description on it.

Sergeant Louis Cruz, who had assisted Sergeant Olivas in this case, testified that he received a phone call from Nirran Wells on June 8, 1998, which he summarized as follows: "Mr. Wells didn't identify himself initially.  He told me that he was Andrew Lewis's cellmate and that Andrew Lewis had told him details regarding the murder and that Andrew Lewis told him that he had switched the gun with ["Pone"] that was used in the

murder, that the gun that O.P.D. [Oakland Police Department] had was not the murder weapon."

Nirran Wells, called as a prosecution witness, acknowledged that he had shared a cell with appellant, but claimed he had never heard appellant talk of having witnesses killed. The prosecutor reviewed with Wells a large portion of his preliminary hearing testimony, in which Wells had testified about much of what appellant had told him about the shootings and about his plan to have witnesses killed. Wells claimed at trial that his preliminary hearing testimony was false. Wells also admitted giving police a statement containing details about appellant's plan for having witnesses killed, but said that it was in large part false.[3]

Defense Case

Jenae Williams testified that she was with appellant when he stopped at Harry's Liquor Store on the night of May 22, 1998. Appellant stopped at the store when he saw his friend Sean. Williams waited in the car and saw up to 10 men approach appellant just inside the store. The men got in appellant's "face" and he looked afraid. As appellant left the store, some of the men were "throwing" what might have been gang signs with their hands. After appellant got back in the car and started to drive away, Williams heard a loud, shattering noise and something came through the front passenger window of the car. Williams dropped down and appellant dropped down over her, asking if she was okay. Williams was traumatized and in shock. The car came to a stop and appellant got out, apparently going towards the back of the car since Williams could not see where he went. Williams feared for her life, so she got out of the car and started running up the hill. As she ran, she heard three or four gunshots. She eventually found a friend she had been with earlier that day.

Emanuel Gabriel testified that he had been friends with appellant for several years. He stopped at Harry's Liquor Store on the night of May 22, 1998, to get something to drink. Gabriel was in the back of the store when he saw appellant inside the store surrounded by a few guys. After Gabriel paid for his drink, appellant was leaving and he said to appellant, "Let's go. That it wasn't really even worth it." Gabriel and appellant walked out of the store together and the people came out after them, talking like they were mad. Appellant and Gabriel got into their cars. Gabriel backed out of the parking lot, but did not drive away as he watched appellant pull out also. There were seven or eight guys approaching appellant, and then Gabriel heard a pop. Appellant's car had stopped because the guys were surrounding it. Gabriel then saw a girl get out of appellant's car and run away.

Gabriel saw appellant get out of the car and go around to the back of the car, while seven or eight people were standing on the passenger side of the car. Gabriel then saw appellant come out of the crowd, looking scared. The crowd followed him as he slowly backed away. Gabriel then saw a

---

[3] During the defense case, several law enforcement agents testified to Wells's poor credibility as an informant, in particular, his tendency to offer some truthful information and add false information to it. In exchange for his testimony at the preliminary hearing, Wells was released from custody 30 days early.

brown car pulling out, saw appellant by the brown car, and heard shooting. He did not see appellant at that point, and he left the area.

On cross-examination, Gabriel acknowledged that he cooperated with the defense in this case, but that he refused to speak to the prosecution about what happened. Gabriel read in the newspaper that someone had been killed that night and learned that appellant was accused of murder, but he never contacted the police or the district attorney to tell them what he had seen because he did not want to be involved. Gabriel also admitted that he was convicted in 1990 of felony possession of crack cocaine for sale.

Appellant testified that on the night of May 22, 1998, he stopped at Harry's Liquor Store because he saw Emanuel Gabriel pull into the parking lot; appellant had not seen Gabriel for a while and wanted to see how he was. Jenae Williams was with him and waited in the car while he went to see Gabriel, whom appellant called "E.G." When appellant walked into the store, Raymond Daniels called his name, and was cursing. He knew Daniels from high school. After high school, some of appellant's friends had problems with Daniels.

There were close to 10 people with Daniels, who said to appellant things like, "What is up, motherfucker?" Appellant was shocked and nervous, and he asked Daniels what the problem was. Daniels and the other people were blocking appellant's exit from the store when Gabriel came up and put a hand on appellant; Gabriel said "Man, just go. Just go. . . . It's not worth it." Two of the guys got out of the way and appellant left the store. The group of guys followed appellant out and said all kinds of threatening things to him. Appellant got into his car and started to drive off when he heard his window burst. He grabbed Williams, who was screaming, threw her to the floor, and got on top of her. Appellant heard people yelling "get him." He saw people at the passenger door and saw that the window was broken. He tried to hold the door shut as people tried to open it; he was scared because he thought someone shot his window out.

Williams then got out of the car and ran away. Appellant went to the trunk and grabbed a gun. The crowd moved down towards the trunk and appellant backed away from them, looking for Williams and trying to get away. He backed into a car. He turned around fast and saw a car; he then saw Raymond Daniels pointing a gun at him, with a mean, crazy look on his face. Appellant's hand came out of his pocket with a gun and he shot three times into the car, without even aiming. Appellant described the shooting: "I don't know why. It was a reaction. It was a gun right there. I'm trapped. On this side I got this crowd chasing me. I just ran into something and I turn around and it is a gun."

After appellant shot the gun, the crowd parted and he ran to his car, jumped in, and sped off. He drove to his parents' house, got some money, got some clothes, and drove in a blue Honda to a friend's house in Berkeley. The friend was not at home, so appellant drove to the home of his friend Torrance Mackey. Appellant gave Mackey his gun and Mackey gave him another one because appellant was scared that the people from the liquor store might be looking for him. Appellant then went to the home of his girlfriend, Dyendis Davis, where he spent the night. He did not tell her what had happened. He was arrested the next morning after leaving Davis's house.

Nirran Wells was appellant's cellmate, and appellant talked to him about the shooting and let him read the police reports. Appellant acknowledged giving the witness information to Davis when she visited

him at jail; he did it surreptitiously because he knew he was not supposed to have witness information.  He gave her the names because his lawyer had not investigated fully and appellant and his father had talked about hiring a private investigator to talk to witnesses.  He never told Nirran Wells that he was going to have anyone kill the witnesses.

On cross-examination, appellant admitted that he had been convicted in April 1997 of felony reckless driving while fleeing and evading a pursuing police officer.

Appellant's father, Nathaniel Hawthorn Lewis, II, testified that he had asked appellant to give him the names of the witnesses in the case so that he could give the names to an investigator he planned to hire. Appellant had said he would get the information to his father either through his friend Mackey or his girlfriend Dyendis.

People v. Lewis, No. C135099, slip op, at 1-11, (Cal. Ct. App. January 21, 2003)

(hereinafter "Slip op.") (Ex. 1, Appendix A.)

## DISCUSSION

A.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus submitted by an individual in custody pursuant to a state court judgment only if the custody violates the United States Constitution, laws or treaties.  28 U.S.C. § 2254(a) (2005); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1) (2005); Williams v. Taylor, 529 U.S. 362, 402-403 (2000).

A state court decision qualifies as "contrary to" federal law if it directly contravenes a Supreme Court decision on a question of law, or reaches a conclusion converse to a Supreme Court decision with materially indistinguishable facts.  Id. at 413. A state court decision involves an "unreasonable application" of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 412-413.  In determining whether a state court's decision contravenes or unreasonably applies clearly

established federal law, a federal court examines the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision.  LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  In this case, the highest state court to issue a reasoned opinion was the California Court of Appeal.

B.    Legal Claims

1.    Ineffective Assistance of Trial Counsel

Petitioner contends that his trial attorney was ineffective because she did not move for a mistrial or request a curative instruction in response to a prospective juror's damaging comments.  Petitioner alleges that discussions between the trial court judge and a prospective juror took place in the presence of the entire panel of prospective jurors, including those who ultimately served as jurors during trial.  Petitioner claims that these exchanges had a prejudicial impact on the jury.

During voir dire, the following discussion took place between the trial court and prospective juror John Raess ("Raess"):

"[THE COURT]:  Mr. R[.], are there any questions that you heard or anything I've asked that might lead you to believe you could not be fair and impartial in this case?

"[RAESS]:  I have kind of – the defendant's name rang a bell with me.  Is Funk Town involved with this at all?

"[THE COURT]:  Well, I can tell you the area where this occurred. Funk Town has some different borders, depending on who is talking about it.

"[PROSECUTOR]:  Your Honor, may we approach?

"[THE COURT]:  Okay.

"(Court and counsel confer, not reported.)

"[THE COURT]:  Mr. R[.], in discussion with the lawyers, your question was did this take place in Funk Town?

"[RAESS]:  Funk Town is involved with this.

"[THE COURT]:  The answer to that is yes.  [¶]  Would that affect your ability?

"[RAESS]:  It may.

"[THE COURT]:  Without being specific, what is your acquaintance or relationship with Funk Town?

"[RAESS]:  I worked with the Oakland Tribune from the '80s to the early 1990s when Funk Town first became active.

"[THE COURT]:  So do you think if the facts in this case concerned Funk Town that you could not be a fair and impartial juror?  Because somebody can throw up their hands, that's it, as far as I'm concerned, this guy is guilty.

"[RAESS]:  Well, I think there's a fair – considering what they were

involved with and what was going on around that time, I think fair assumption.

"[THE COURT]:  But then tarring somebody with this, you know. The question is I don't know if he's involved or not involved.  [¶]  The answer to your question would have been yes."

(Voir Dire Reporter's Transcript "VDRT" at 161-162.)

The court also asked Raess questions about his job and experiences with crime and the criminal justice system.  Id. 164-166.  After Raess mentioned that some of his work for the *Oakland Tribune* involved reporting on Oakland courts, the defense attorney asked whether that experience might affect him as a juror.  Id. at 167.  Raess responded, "I know stuff gets left out, stuff doesn't get brought up."  Id.  He also said he might "wonder what's not being told us, what we're not hearing about."  Id.  Raess thought "most of the time people who are brought to the court are guilty."  Id.  The defense attorney asked Raess if he could presume petitioner was innocent to which he replied, "I think there's a 90 percent probability that he's guilty."  Id. at 168.

Defense counsel challenged Raess for cause and he was removed, but counsel did not move for a mistrial.  Petitioner contacted defense counsel and asked why she did not move for a mistrial or request a curative instruction.  In a declaration, defense counsel stated:

> "6.  My failure to request a mistrial or request an admonition was due to inadvertence on my part, and not based on any tactical decision.  I believe it would have been in my client's best interest to seek a mistrial at that point, and to convene a new jury voir dire that did not include the jury members that had been tainted by exposure to the prospective juror R.'s highly damaging statements, or at least request an admonition from the court.  [¶]  7.  My failure to request a mistrial or admonition from the court was error due to my own inadvertence to diligently protect and defend Mr. Lewis' [sic] rights to a trial by impartial jury."

(Pet'r Ex. C at unnumbered appendix; Pet. at 10.)

Petitioner contends that Raess's statements during voir dire violated his constitutional rights in two different ways.  First, petitioner argues that the trial court's discussion of Funk Town implied that the charged crimes were gang related.  Second, petitioner claims that the jury pool was tainted by Raess's statement that "there was a 90 percent probability that [petitioner] was guilty."  Petitioner contends that defense counsel

was ineffective for failing to move for a mistrial or request a curative instruction to the jurors with respect to Raess's comments.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  Id.

In order to prevail on an ineffective assistance claim, petitioner must establish deficient performance and resulting prejudice.  First, an attorney's performance qualifies as deficient if it falls below an "objective standard of reasonableness."  Id. at 687-688.  Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Id. at 689.  Second, prejudice has resulted if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."  Id. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  Id.  If the petitioner cannot establish incompetence under the first prong of Strickland, then a federal court considering a habeas ineffective assistance of counsel claim does not have to analyze prejudice under the second prong.  Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998).

The California Court of Appeal found that no judicial misconduct occurred.  (Slip op. at 15.)[4]  As the appellate court noted, the trial court told Raess that the crime involved Funk Town only at the direction and approval of both the defense counsel and prosecutor.

---

[4] Petitioner raised these claims in the California Court of Appeal by alleging judicial misconduct in his direct appeal, and ineffective assistance of trial counsel in his state habeas petition.  The Court of Appeal rejected the judicial misconduct claim in an extended discussion, and summarily rejected the claim that counsel was ineffective in failing to file the mistrial motion.

Id.  The Court of Appeal determined that the trial court's statement was an attempt to ascertain Raess's bias against Funk Town.  Id.  Accordingly, the court concluded that this was a proper and necessary part of voir dire.  Id.;  (citing People v. Martinez, 228 Cal.App.3d 1456, 1465 (1991) ("The purpose of questioning by the court and counsel is to convince jurors to reveal their thoughts and opinions candidly.  This is to the criminal defendant's advantage since jurors who reflect such attitudes can be discovered and eliminated from the process.")  The appellate court also ruled that the trial court was correct when it said it was careful not to say petitioner was a member of Funk Town.  Id. The trial court specifically told Raess that he did not know whether petitioner was involved with Funk Town, and the Court of Appeal viewed that the discussion "generally was fairly obscure."  Id.  The appellate court pointed out that the trial court reminded Raess of the presumption of innocence and later advised the jury that they "must determine the facts from the evidence received in the trial and not from any other source." Id.  The Court of Appeal presumed the jury followed the court's instructions, and found nothing in the record to depart from this assumption.  Id. at 15-16.  The appellate court noted that the trial court did not allow the prosecution to introduce any evidence of petitioner's Funk Town affiliation, further shielding petitioner from prejudice.  Id. at 16. The appellate court concluded that "the court's interaction with J.R. did not rise to the level of misconduct and [petitioner's] claim that he was prejudiced by the trial court's comments cannot succeed."  Id.

     The appellate court reasonably found that the trial court's responses to Raess's questions were proper.  Raess asked if Funk Town was involved with the crime, to which the court responded, "Funk Town has some different borders, depending on who is talking about it."  The court's answer implied that Funk Town refers to a geographical location.  When Raess stated "Funk Town is involved in this" the court answered in the affirmative, and asked Raess additional questions to determine whether petitioner's association with Funk Town would affect Raess's ability to be impartial.  The state appellate court reasonably concluded that there was no judicial misconduct, or the

possibility of prejudice from Raess's statements during voir dire. As there was no judicial misconduct or prejudice, counsel's failure to raise this claim in a motion for a mistrial was neither deficient nor prejudicial. See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) (trial counsel cannot have been ineffective for failing to raise a meritless motion).

With respect to Raess's statement that he believed that ninety percent of criminal defendants are guilty, there is no evidence that the jurors reacted to this statement or were affected by it. Raess did not express any personal knowledge about petitioner or the present case – he clearly had a broad bias against criminal defendants. Petitioner does not point to any evidence that the jurors used Raess's sentiment against petitioner, or even considered it. Raess did not claim to have any authority on the matter, and there was no reason for the juror's to find his statement credible. In any event, the trial court dismissed Raess for cause, and the jury was instructed to presume petitioner innocent and determine the facts of the case from the evidence received at trial. Under these circumstances, there is no reasonable likelihood that the outcome of the trial would have been different had counsel requested a curative instruction or moved for a mistrial. Consequently, the state courts reasonably concluded petitioner did not receive ineffective assistance of counsel in this regard.

### 2. Prosecutorial Misconduct

Petitioner contends that the prosecutor's comments at trial violated his right to due process. Petitioner alleges that the prosecutor committed misconduct because he repeatedly violated the court's order excluding any evidence regarding petitioner's prior police contacts, possession of a bulletproof vest, and gang affiliation.

Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. Darden v. Wainwright, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Id.; Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process

analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.")  Claims of prosecutorial misconduct are reviewed "on the merits, examining 'the entire proceeding[s]' to determine whether the prosecutor's remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Hall v. Whitley, 935 F.2d 164, 165 (9th Cir. 1991) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).

A.     Prosecutor's Statements Regarding Prior Police Contacts

Petitioner contends that the prosecutor violated the court's ruling to exclude evidence of prior contacts between petitioner and the police.  Petitioner claims that the prosecutor violated the ruling during his opening statement to the jury, when he referred to two separate instances of petitioner's contact with the police.

In his opening statement, the prosecutor first described the shootings.  (RT at 46-54.)  The prosecutor then explained how the police investigation resulted in petitioner's arrest:

> So the police come.  And Raymond Daniels says to the police, Drew. He also says yellow Cadillac.  One of the first officers who responded, Officer Chris Jenson thought, and he put together the description of Drew and put together the description of the yellow Cadillac, and said *I remember stopping in Torrance Mackey's neighborhood on 8th and Foothill in December of 1997 a Drew who had a yellow Cadillac, let me get that field contact card.*  And the field contact card that he had in his car, the one that he retrieved that night after the shooting in East Oakland said December 22, 1997, the neighborhood of 8th and Foothill near Lake Merritt, Andrew Lewis, 1977 yellow Cadillac with the license plate.
> And so through DMV records, they went to where the Cadillac was registered on Homestead Street in Oakland.  No Cadillac.  *Through other cross referencing, the sergeants at the homicide scene were able to determine that Andrew Lewis was living with his parents in San Leandro.* They go there to his parents' home and there is the yellow Cadillac with the busted out passenger's window.

(RT at 55, italics added.)

Following the prosecutor's opening statement, defense counsel moved for a mistrial on the grounds that the prosecutor violated the court's in limine ruling regarding petitioner's prior police contacts.  The court denied counsel's motion, finding that the prosecutor's statements did not imply that petitioner was stopped for anything serious, but

instead suggested that he was stopped for a traffic violation.  (RT at 66-67.)

The California Court of Appeal determined that the prosecutor's statements did not prejudice petitioner.  (Slip op. at 18.)  The court reasoned that the prosecutor's reference to a police officer stopping petitioner simply suggested a routine traffic stop.  <u>Id.</u>  The court found that the prosecutor's remark about "other cross referencing" also suggested that the officers were merely consulting DMV and other records to find petitioner's address.  <u>Id.</u>  The court maintained that it was "highly unlikely" that the jury was convinced that petitioner had a criminal disposition because the police stopped him in December 1997.  <u>Id.</u>  The court concluded that there is not a "reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion" and, thus, the comments "did not render the trial fundamentally unfair."  <u>Id.</u>; (quoting <u>People v. Berryman</u>, 6 Cal.4th 1048, 1072 (1993).

The state appellate decision was not contrary to, or an unreasonable application of, clearly established Supreme Court law.  The decision cited the proper federal standard in finding no error, and the court asserted that even if the prosecutor's comments "rose to the level of misconduct, they certainly were not so egregious as to have prejudiced [petitioner]."  (Slip op. at 18) (citing <u>People v. Hill</u>, 17 Cal.4th 800, 819 (1998).  Furthermore, the state appellate court's application of the federal law was not unreasonable.  The court reasonably found that there was no constitutional error because the prosecutor's statement that Officer Chris Jensen "stopping" petitioner referred to, at most, a routine traffic violation.  The prosecutor mentioned a "field contact card," not a police report or even a traffic citation.  The sergeants' "other cross referencing" also suggested routine investigation, and certainly did not suggest that petitioner had a propensity for criminal behavior.  Consequently, the state court reasonably concluded that the prosecutor's statements did not render the trial fundamentally unfair so as to violate petitioner's right to due process.

### B.   Testimony Regarding Petitioner's Bulletproof Vest

Petitioner contends that the prosecutor committed misconduct because a

prosecution witness mentioned petitioner's bulletproof vest. Petitioner argues that the prosecutor violated the trial court's order to exclude evidence that petitioner was in possession of a bulletproof vest at the time of his arrest. Raymond Daniels ("Daniels") testified that he had once seen petitioner and his friend Torrance Mackey ("Mackey") at a party in Berkeley. (RT at 108.) On direct examination, the prosecutor and Daniels had the following exchange:

> "[PROSECUTOR]: What else do you remember about Andrew and/or Torrance at this party that you haven't told us?
> "[DANIELS]: It seemed like they were bigger than what they usually would be. I think they had on bullet proof vests.
> "[PROSECUTOR]: What makes you say that? Did they have jackets on?
> "[DANIELS]: Yes."

(RT at 110-111.)

Defense counsel objected, arguing that Daniels's comment about the bulletproof vest violated the court's in limine ruling. The trial court disagreed, and asserted that the in limine motion related only to a bulletproof vest in petitioner's possession at the time of his arrest. Defense counsel moved for a mistrial, and the trial court denied the motion.

The Court of Appeal concluded that the prosecutor's question was not improper. The appellate court agreed with the trial court that the in limine motion did not cover the Berkeley incident. (Slip op. at 19.) Therefore, the court reasoned, the prosecutor's question about the vest did not constitute misconduct. Id. In addition, the appellate court noted that the prosecutor said that the information about petitioner wearing a bulletproof vest in Berkeley was new to him. Id. In finding no misconduct, the California Court of Appeal stated that Daniels's "testimony about the party was tangential to the issues in the case." Id. Although the court did not cite the Darden standard explicitly, citation of federal cases is not required "so long as neither reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002). Daniels's testimony reflected that he believed petitioner had on a bulletproof vest at a party at a different time and location than the crime. In addition, Daniels only *believed* petitioner had a vest, based on the observation that petitioner "seemed bigger than [he] usually would be;"

Daniels never stated he ever actually saw petitioner ever wear such a vest.  Moreover, the trial court specifically told the prosecutor, in the presence of the jury, that the questioning was getting "too far afield" from the issues at hand.  Under these circumstances, Daniels's testimony and the prosecutor's questions did not render the trial fundamentally unfair in violation of due process.

C.    Exploration of Witness' "Ghost Town" Reference

Petitioner contends that the prosecutor violated the court's pretrial ruling to exclude reference to gangs or gang involvement in petitioner's case.  Daniels testified that he and petitioner "squared up" at Harry's Liquor Store moments prior to the crime.  The prosecutor and Daniels then had the following exchange:

> "[PROSECUTOR]:  What happened next?
> "[DANIELS]:  Andrew walked out the store rambling about some stuff about Ghost Town and where he was from and all this.
> "[PROSECUTOR]:  Territorial stuff?
> "[DANIELS]:  Yes."

(RT at 117.)

Petitioner argues that the prosecutor's follow-up question, "[t]erritorial stuff?" was improper because he encouraged gang-related testimony, which the trial court had already ruled as inadmissible.

The California Court of Appeal reasonably found no prejudicial misconduct from the prosecutor's questions.  As the court explained, the Ghost Town reference "sounded more like a geographical reference than a gang reference."  (Slip op. at 20.)  The court made this determination in light of Daniels's earlier testimony:

> "[PROSECUTOR]:  When Andrew went to high school, do you know where he was staying?
> "[DANIELS]:  I think he was from Ghost Town or something like that.
> "[PROSECUTOR]:  Where is that?
> "[DANIELS]:  I'm not sure.
> "[PROSECUTOR]:  Back then, do you know where Torrance was staying?
> "[DANIELS]:  Also from the Ghost Town area."

(RT at 106.)  The court found that "it would be reasonable to understand [petitioner's] alleged ramblings about Ghost Town to be territorial, given that his defense involved the claim that the people hanging out at Harry's Liquor Store targeted him as someone from

outside the neighborhood." (Slip op. at 20.) Thus, the court ruled that even if the prosecutor's follow up question "bordered on the improper, there is very little likelihood that the jury took the question and answer as showing that [petitioner] was a gang member and therefore of bad character." Id. As Daniels's testimony merely defined Ghost Town as a region of Oakland, neither the prosecutor's question nor Daniels's comments linked Ghost Town to any gang, and there was no testimony regarding gangs or defining Ghost Town or Funk Town as a gang, the Court of Appeal reasonably concluded the prosecutor's question "[t]erritorial stuff?" was too ambiguous to convey to the jury that petitioner was affiliated with any gangs or gang members. Under these circumstances, the prosecutor's question did not "so infect the trial" as to render it fundamentally unfair in violation of petitioner's right to due process.

### D.      Introducing Witness Statement Regarding "Funk Town"

Petitioner contends that there is a second instance in which the prosecutor violated the trial court's order prohibiting any reference to gangs. Petitioner alleges that during the direct examination of petitioner's jail cellmate, Nirran Wells ("Wells"), the prosecutor made a gang-related reference when he mentioned Funk Town.

At trial, Wells recanted nearly all of his statements from petitioner's preliminary hearing with respect to petitioner's involvement in the shooting and plan to have witnesses killed. In an effort to impeach Wells, the prosecutor reviewed with Wells in detail the transcript from the preliminary hearing and portions of police reports. Wells testified that he either did not recall making the prior statements or that they were false. At one point, the prosecutor asked Wells the following question:

> "[PROSECUTOR]: Did you tell Sergeant Lou Cruz that morning June 8, 1998, that the gun was used in the murder Andrew Lewis switched with Pone from Funktown and it was a .38 snubnose?
> "[Wells]: No."

(RT at 417.) After this exchange, defense counsel asked to approach the bench. The trial court responded: "I know what the issue is. I think it's perfectly okay to ask that question. [¶] The question is whether he said that to the police. You can go on the record when this is over. I think it is a perfectly proper question under the circumstances." (RT at 417-418.)

The Court of Appeal found that the prosecutor's question was improper, but not prejudicial. (Slip op. at 22.) The court reasoned that the prosecutor did not intentionally bring in impermissible evidence before the jury as he was in the middle of a lengthy review of Wells's prior statements and testimony. Id. The California Court of Appeal reasoned as follows:

> We do not believe that the question prejudiced appellant. That appellant might as a result have been indirectly linked to a gang (assuming the jury understood the brief reference to Funk Town to be a gang-related reference), did not render the entire trial fundamentally unfair. (See *People v. Hill*, *supra*, 17 Cal.4th at 819.)
> The jury acquitted appellant of murder and found instead that he was guilty of voluntary manslaughter. The evidence presented at trial, including the testimony of Daniels, Goodall, Jiltonirlo, as well as that of Sergeant Olivas regarding what informant Wells had told him, overwhelmingly showed that Taylor and Daniels were ducking down in their car, trying to protect themselves and get away, as appellant was shooting them at point blank range.[5] Only appellant testified that Daniels was pointing a gun at him, and his version of events simply was not very credible, in light of all of the evidence presented.[6] Therefore, it is quite improbable that the jury would have found that appellant shot Taylor and Daniels in true self-defense but for the Funk Town reference. Indeed the jury seems to have given appellant the benefit of the doubt in finding that he either acted in imperfect self-defense or in response to provocation.
> The peripheral gang reference complained of clearly was not so important as to undermine the defense case. We find it highly unlikely that any juror improperly applied the reference to Funk Town and conclude that the reference did not affect the outcome of the trial. (See *People v. Berryman*, *supra*, 6 Cal.4th at 1072.)

Id. at 22-23.

The state appellate court reasonably concluded that the prosecutor's question "did not render the trial fundamentally unfair" and was not prejudicial. At most, the prosecutor's questions only indirectly linked petitioner to a gang: the prosecutor's

---

[5] Indeed, as Olivas's testimony showed, Wells provided police with detailed information about the circumstances of the shooting, which he could not easily have fabricated, regarding appellant's description of Daniels' and Taylor's efforts to escape from appellant and his gun. For example, Olivas testified that "both Mr. Daniels and Travis knew what was happening. They looked at Andrew Lewis and they were both ducking down in the car, since they couldn't get the car to move fast enough they were sitting in the car, trying to duck down to lean over in an attempt to protect themselves."

[6] For example, appellant claimed he only got out of his car because he was worried about Jenae Williams, whom he said had run off after the car window shattered. Williams, however, testified that appellant got out of the car before she did and that she could not see where he had gone. Only then, according to Williams, did she leave the car and start running away.

statement "Pone from Funktown" associates "Pone," not petitioner, to Funk Town.  There was never any mention of a "gang," or any explanation that "Funk Town" was a gang. Under these circumstances, a single, indirect reference to Funk Town did not render the trial fundamentally unfair so as to violate due process.  Moreover, as the Court of Appeal persuasively explained, in light of the strong evidence of petitioner's guilt, there was no prejudice from the prosecutor's questions.  Testimony of three eyewitnesses was that petitioner shot into the victims' car multiple times, and that the victims did not have a gun or threaten petitioner.  In light of the strong evidence of guilt, the prosecutor's isolated and ambiguous reference to Funk Town did not have a substantial and injurious effect on the verdict.

### 3.   Erroneous Jury Instruction

Petitioner contends that his due process rights were violated because the trial court refused to instruct the jury on the theory of defense of another person.  Petitioner argues that this instruction was necessary because there was evidence that he shot the victims to protect his friend, Jenae Williams ("Williams").  Defense counsel requested that the jury be instructed pursuant to CALJIC No. 5.14, which informs the jury that the use of force in defense of another is lawful.[7]  The trial court did give the standard jury instructions on self-defense pursuant to CALJIC No. 5.12.[8]

---

[7] CALJIC No. 5.14, regarding homicide in defense of another, provides: "The reasonable ground of apprehension does not require actual danger, but it does require (1) that the person about to kill another be confronted by the appearance of a peril such as has been mentioned; (2) that the appearance of peril around in [his] [her] mind an actual belief and fear of the existence of that peril; (3) that a reasonable person in the same situation, seeing and knowing the same facts, would justifiably have, and be justified in having, the same fear; and (4) that the killing be done under the influence of that fear alone."

[8] The jury was instructed on justifiable homicide in self-defense:  "The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes: (1) That there is imminent danger that the other person will either kill [him] or cause [him] great bodily injury; and (2) That it is necessary under the circumstances for [him] to use in self-defense force or means that might cause the death of the other person, for the purpose of avoiding death or great bodily injury to [himself].  A bare fear of death or great bodily injury is not sufficient to justify a homicide.  To justify taking the life of another in self-defense, the circumstances must be such as would excite the fears of a reasonable person placed in a similar position, and the party killing must act under the influence of those

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceeding.  Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988).  The error must so infect the trial that the petitioner was deprived of the fair trial guaranteed by the Fourteenth Amendment.  Id.  Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury.  Ducket v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995).  After all, due process does not require that an instruction be given unless the evidence supports it.  Hopper v. Evans, 456 U.S. 605, 611 (1982).

An examination of the record is required to see precisely what was given and what was refused and whether the given instructions adequately embodied the petitioner's theory.  United States v. Tsinnijinnie, 601 F.2d 1035, 1040 (9th Cir. 1979), cert denied, 445 U.S. 966 (1980).  In other words, it allows a determination of whether what was given was so prejudicial as to infect the entire trial and so deny due process.  Id.

A habeas petitioner whose claim involves a failure to give a particular instruction bears an "especially heavy burden."  Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).  However, it is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case.  Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 2000).  Failure to instruct on the theory of defense violates due process if "'the theory is legally sound and evidence in the case makes it applicable.'"  Clark v. Brown, 450 F.3d 898, 904-905 (9th Cir. 2006) (quoting Beardslee v. Woodford, 358 F.3d 560, 577 (9th Cir. 2004)).  However, the petitioner is not entitled to have jury instructions embodying the defense theory if the evidence does not support it.  Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005).

In determining whether petitioner was entitled to a jury instruction on the defense of another, the California Court of Appeal examined petitioner's testimony.  Petitioner explained why he shot the victims:

---

fears alone.  The danger must be apparent, present, immediate and instantly dealt with, or must so appear at the time to the slayer as a reasonable person, and the killing must be done under a well-founded belief that it is necessary to save one's self from death or great bodily harm.

"[DEFENSE COUNSEL]: Okay. Did you at any time that night actually want to kill or wound somebody?

"[PETITIONER]: No. When I shot that gun, I just wanted that, the gun that man had away from me and out of my direction.

"[DEFENSE COUNSEL]: And why did you shoot?

"[PETITIONER]: Because that is the only thing that I had. I was – I was trapped on one side with these people that are after me. The other side I'm trapped with this car and I'm stuck in the middle. And there is a gun here and there is crazy people here. I don't – that is the only thing. It was a reaction; really. When I saw that gun, it was just a reaction. [¶] My mind didn't say, okay, well, you have to shoot these people now. It just happened.

"[DEFENSE COUNSEL]: Did you think you were in danger at that moment?

"[PETITIONER]: I knew I was. I didn't think. I knew I was.

"[DEFENSE COUNSEL]: And what did you think was going to happen?

"[PETITIONER]: That I was going to be killed. Shot."

(RT at 1033-1034.) The Court of Appeal determined that petitioner was not entitled to an instruction on defense of another and that the trial court was correct in finding that petitioner was entitled to a self-defense instruction. (Slip op. at 25.) The appellate court reasoned that petitioner's "testimony regarding the actual moment of the shooting, however shows that he was concerned at that time only with defending himself." (Id. at 24.) The court also noted that petitioner's testimony contradicted Williams's testimony, therefore undermining petitioner's credibility. (Id.)

The Court of Appeal's conclusion was reasonable when considered in light of the evidence presented at trial. On direct examination, petitioner testified that people were threatening him as he walked out of Harry's Liquor Store. (RT at 1011-1012.) Petitioner got into his car, where Williams was waiting for him. (Id.) As petitioner drove away, his "window burst" and he thought someone shot his window. (Id. at 1013.) Petitioner covered Williams with his body and held her down; Williams was "screaming" and "hysterical." (Id.) A crowd moved toward petitioner's car, and Williams said, "Let me go. They are going to kill us." (Id. at 1015.) Williams got out of the car and petitioner saw her running away "a million miles a minute." (Id. at 1016.) Petitioner then got out of his car and took out a gun from his trunk. (Id.) The crowd surrounded petitioner, and petitioner turned around and saw Daniels in a car with a gun pointed at him. (Id. at 1020.) Petitioner fired three shots into the car, ran back to his own car, and drove away. (Id. at 1021.) Petitioner did not know where Williams was at this point. (Id.)

The evidence provided by petitioner's own testimony rebuts the possibility of an instruction on defense of another. Petitioner's testimony conveys that the shooting was triggered by Daniels pointing a gun at *him*, not at Williams. Petitioner's testimony does not show that he fired his gun because he believed Williams's life was in peril. As explained above, Williams testified that at the time of the shooting she was already running up a hill, therefore she was no longer amidst the crowd and or in the zone of danger. According to petitioner's own testimony, he believed his life was in danger and he thought he was going to be killed. Consequently, the self-defense instruction adequately addressed the imminent danger petitioner felt he was in moments before he fired the gun, and an instruction on the defense of another was not supported by the evidence presented at trial.

Accordingly, the state courts' rejection of petitioner's claim was not contrary to, or an unreasonable application of, clearly established federal law.

4.      Ineffective Assistance of Appellate Counsel

Petitioner contends that his appellate counsel's ineffective assistance violated his right to due process. The California Supreme Court rejected petitioner's claim that the trial court erred in failing to instruct the jury on defense of others on the ground that it was untimely. Petitioner argues that his appellate counsel was ineffective because this procedural default precluded state and federal review of the claim. Petitioner alleges that he wrote a letter to appellate counsel asking why she had not presented the claim to the California Supreme Court after it had been rejected by the Court of Appeal. (Pet. at 17-18.) Appellate counsel responded that she did not believe relief on that claim was likely, but acknowledged that she should have raised it for the purposes of exhausting the claim. See Ex. C to First Amended Habeas Corpus Petition ("I don't think that on the evidence presented the trial court's ruling denying the instruction [on defense of others] would have been found by either the state court or the federal court to be legal error.").

The Due Process Clause guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).

Claims of ineffective assistance of appeal are reviewed according to the standard set out in <u>Strickland</u>. <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir. 1989). A defendant therefore must show that counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. <u>Id.</u> at 1434 n.9 (citing <u>Strickland</u>, 466 U.S. at 688, 694). It is important to note that appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant. <u>Jones v. Barnes</u>, 463 U.S. 745, 751-754 (1983). The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. <u>Miller</u>, 882 F.2d at 1434. Appellate counsel therefore will frequently remain above an objective standard of competence and have caused client no prejudice for the same reason – because he declined to raise a weak issue. <u>Id.</u>

Petitioner contends that appellate counsel should have raised the issue that the trial court erred in refusing to instruct the jury on the defense of another. As discussed above, however, this claim is without merit. Because that claim was not valid, it was neither unreasonable nor prejudicial for appellate counsel to have failed to raise it. Accordingly, petitioner's claim of ineffective assistance of appellate counsel fails, and petitioner cannot obtain habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The clerk shall close the file and terminate all pending motions.

IT IS SO ORDERED.

DATED:   9/11/07

_MARTIN J. JENKINS_
United States District Judge